STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KEVIN YEH (CABN 314079)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7063
    Fax: (415) 436-7234
    kevin.yeh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-mj-71019 MAG |
| Plaintiff, | **UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION** |
| v. | |
| ELIO HERNANDEZ-ZUNIGA, | |
| Defendant. | |

## INTRODUCTION[1]

Across five controlled purchases and from his arrest on the pending charges, Elio Hernandez-Zuniga sold or possessed enough narcotics to kill over 100,000 people.[2] Those amounts, however, are likely a fraction of the total drugs he has sold in the Tenderloin District of San Francisco on a regular—perhaps almost daily—basis since at least May 2019, when law enforcement officers first arrested him for trafficking narcotics.

Despite having previously been arrested no less than four times for drug offenses—all four times

---

[1] Pretrial Services has not yet submitted report as of the filing of this memorandum.

[2] Two milligrams of fentanyl is a potentially lethal dose. U.S. Drug Enforcement Admin., Facts About Fentanyl, Feb. 23, 2022 (https://www.dea.gov/resources/facts-about-fentanyl). All weights referenced herein are gross weights.

in the Tenderloin—Hernandez-Zuniga continues to peddle his deadly wares to victims in that decimated neighborhood. A recidivist, Hernandez-Zuniga's ping data and historical cell site location information (gathered pursuant to search warrants) show that he is undeterred in his desire to sell drugs as he commutes virtually daily from Oakland to the Tenderloin to work his shifts.

Not only is he a danger and a menace to the local community where he operates, Hernandez-Zuniga has shown no regard for the law and believes himself to be beyond accountability. If the best predictor of future behavior is past behavior, then there is a substantial chance that Hernandez-Zuniga will flee if released on these charges: he has failed to appear to answer charges against him in three separate cases, resulting in multiple outstanding bench warrants for his arrest. Moreover, neither the arrests nor the charges for his criminal offenses have deterred him from returning to the Tenderloin to continue plying his lethal trade. Indeed, while on probation for the one conviction he has—a misdemeanor—he had already resumed, and was later arrested for, selling drugs in the Tenderloin.

Not only has Hernandez-Zuniga failed to appear in court as required, on February 7, 2022, while on pretrial release with a GPS monitoring device placed on him, he appears to have cut off the monitor intended to ensure that he would not flee. He has not reported to court since.

His failures to appear and the cutting of his court-ordered ankle monitor are unsurprising, however, because Hernandez-Zuniga has every reason to flee. He is unlawfully present in the United States and was deported in 2017, but illegally returned. Furthermore, he has no apparent employment beyond drug trafficking or ties to the community (though he seems to lack any compunction in victimizing it). Given these facts, and in light of the potentially lengthy sentence he faces, Hernandez-Zuniga is undoubtedly a flight risk who cannot be counted on to voluntarily appear on these charges.

The Tenderloin is awash in the very drugs Hernandez-Zuniga sells each day. His chosen place of business has had more overdose deaths than any other neighborhood in San Francisco, "with many of the deaths occurring outdoors and on sidewalks in front of buildings," including mere steps outside this courthouse.[3] In 2020, 73 percent of overdose deaths in San Francisco involved at least fentanyl, and 54

---

[3] Yoohyun Jung, "Tracking San Francisco's drug overdose epidemic," S.F. CHRONICLE (July 20, 2022), https://www.sfchronicle.com/projects/2021/san-francisco-drug-overdoses-map/.

percent involved at least methamphetamine. 41 percent of overdose deaths involved both.[4] Hernandez-Zuniga sold both.

Hernandez-Zuniga's chosen line of work has helped earn San Francisco the horrific distinction of having the highest overdose death rate of any county in California, including the highest rate of death by fentanyl, and having the second highest rates for both overdose and death by fentanyl of any county *in the country*.[5] Tragically, some of these deaths in San Francisco involve minors, as "fentanyl overdose deaths among American teenagers [have] tripled in the past two years."[6]

This case may be the first time that Hernandez-Zuniga will finally face some consequence for his decision to knowingly prey on and profit from the vulnerabilities—indeed, the lives—of others. For the safety of the Tenderloin community and San Francisco, and because he has shown both a propensity to flee from accountability and a persistent refusal to abide by the rules, the government respectfully requests that Hernandez-Zuniga be detained pending trial.

**FACTUAL BACKGROUND**

**I.  Hernandez-Zuniga's Has Been Selling Drugs In The Tenderloin Since 2019 And Has Escaped Facing Any Real Consequence.**

On August 3, 2022, the United States charged Elio Hernandez-Zuniga by complaint with selling fentanyl and methamphetamine in San Francisco's Tenderloin. But the true extent of his narcotics trafficking stretches back over more than three years.

On May 5, 2019, Hernandez-Zuniga was seen in possession of suspected narcotics at 730 Eddy Street in the Tenderloin. Officers arrested him and found 7.2 grams of suspected cocaine base and 3.1 grams of suspected heroin on him.[7] ("Case #1.") Undeterred, approximately two weeks later, on May 22, 2019, Hernandez-Zuniga sold narcotics to an individual around 670 Eddy Street. Officers arrested him and found 2.8 grams of suspected cocaine base. Stemming from the latter incident, on June 27,

---

[4] *Id.*

[5] *Id.*

[6] Kevin Fagan, "San Francisco's youngest drug overdose victim last year was 14. Her mother still doesn't know what happened," S.F. CHRONICLE (Apr. 11, 2022), https://www.sfchronicle.com/sf/article/San-Francisco-drug-overdose-17067557.php.

[7] The charges were dismissed for lack of evidence.

2019, Hernandez-Zuniga was convicted of misdemeanor accessory to a felony under California Penal Code 32 and was sentenced to two years of probation and four days in jail. ("Case #2.")

On January 14, 2021, while still on probation, Hernandez-Zuniga sold suspected methamphetamine to an undercover San Francisco Police Department ("SFPD") officer around Larkin and O'Farrell Streets in the Tenderloin. He was arrested and found with 6.4 grams gross of suspected methamphetamine and 4.5 grams of suspected heroin. ("Case #3.")

On March 2, 2021, Hernandez-Zuniga failed to appear in court as required. Two bench warrants were issued in Case #2 and #3.

While those two bench warrants were outstanding, on January 26, 2022, Hernandez-Zuniga sold suspected cocaine base to an undercover SFPD officer at 834 Larkin Street. He was arrested and found with 7.3 grams of suspected heroin, 4.8 grams of suspected cocaine HCL, 18.3 grams of suspected methamphetamine, 19.1 grams of suspected cocaine base, and 9.2 grams of fentanyl. ("Case #4.") On January 28, 2022, the court ordered Hernandez-Zuniga released on his own recognizance, though he had to wear a GPS monitoring device. The court set release conditions and ordered Hernandez-Zuniga to stay away from certain parts of the Tenderloin.

On February 8, 2022, a sheriff's deputy reported to the court that Hernandez-Zuniga's GPS device had been "cut, damaged, or removed" on February 7th. Alerts were also sent to Hernandez-Zuniga to contact the Sheriff's Office as he was previously instructed, but he did not do so, nor did he return the Sheriff's Office's multiple missed calls or voicemails. Thus, in the report to the court, the deputy concluded that Hernandez-Zuniga was "not complying with the orders of the Court" and requested that his release order be revoked. Sheriff's affidavit warrants were then issued.

On February 15, 2022, Hernandez-Zuniga failed to appear in court, so three bench warrants (one each in Case #2–4) were issued for his arrest, though they were stayed for two days. On February 17, 2022, the three bench warrants were issued and remain outstanding.

## II.     The May 26, 2022 Controlled Purchase.

On May 26, 2022, at approximately 3:19 p.m., an SFPD sergeant working in an undercover capacity ("the UC") approached Hernandez-Zuniga in front of 895 Geary Street in San Francisco's Tenderloin neighborhood, where Hernandez-Zuniga was riding back and forth on a scooter. The UC

DETENTION MEM.                      4
22-mj-71019 MAG

said to Hernandez-Zuniga, "I need one-hundred of crystal," meaning he wanted to purchase $100 worth of methamphetamine. Hernandez-Zuniga said "okay." The UC then asked Hernandez-Zuniga to exchange phone numbers. The UC gave Hernandez-Zuniga a cell phone number and introduced himself using a fake name. Hernandez-Zuniga replied that his name was "Leo" and called the number provided by the UC so that the UC could have Hernandez-Zuniga's phone number. Hernandez-Zuniga then called an associate of his over to their location.

The associate quickly approached. As Hernandez-Zuniga turned away from the UC to speak with his associate, Hernandez-Zuniga removed a rectangular metal container from his right cargo pants pocket. Hernandez-Zuniga and the associate conversed briefly while Hernandez-Zuniga counted the contents of the rectangular metal container. The associate handed Hernandez-Zuniga something which he combined with the items he removed and counted from the rectangular metal container. Hernandez-Zuniga then handed the UC 10 press-lock style bags containing suspected methamphetamine in exchange for $100. The UC then left the area.

Another officer video-recorded the UC and Hernandez-Zuniga's interaction. The suspected methamphetamine tested presumptive positive and weighed approximately 7.0 grams.

**III.   The June 7, 2022 Controlled Purchase.**

On June 7, 2022, the same UC contacted Hernandez-Zuniga via text message and told him that he wanted to meet that day and purchase $100 worth of methamphetamine and $100 worth of fentanyl. Hernandez-Zuniga agreed.

At approximately 3:20 p.m., the UC met Hernandez-Zuniga in front of 869 Geary Street in the Tenderloin. After greeting each other, the UC handed Hernandez-Zuniga $200. Hernandez-Zuniga handed the UC a bag containing ten individually wrapped rocks of suspected methamphetamine. The UC reminded Hernandez-Zuniga that he wanted $100 worth of fentanyl, but said that Hernandez-Zuniga could "make it up" to him next time. Hernandez-Zuniga said okay and the UC then walked away.

Hernandez-Zuniga then caught up to the UC and told the UC to hold on and that he could get the remaining $100 worth of what he owed if the UC waited. The UC said he would wait and Hernandez-Zuniga left. A few minutes later, Hernandez-Zuniga returned and handed the UC $100 worth of suspected methamphetamine in a plastic bag. The UC then walked away.

Another officer video-recorded the UC and Hernandez-Zuniga's interaction. The suspected methamphetamine tested presumptive positive and weighed approximately 13.1 grams.

### IV. The June 8, 2022 Controlled Purchase.

On June 8, 2022, the same UC contacted Hernandez-Zuniga via text message and arranged to buy $100 worth of fentanyl and agreed to meet around Larkin and Geary Streets in the Tenderloin.

When they met near the corner of Larkin and Post Streets, the UC engaged in a brief conversation with Hernandez-Zuniga and then handed him $100. Hernandez-Zuniga handed the UC three bags of suspected fentanyl. The UC then walked away.

The suspected fentanyl tested presumptive positive and weighed approximately 3.5 grams.

### V. The July 7, 2022 Controlled Purchase.

On July 6, 2022, an SFPD officer posing as the UC texted Hernandez-Zuniga and arranged to purchase two ounces of fentanyl for $1,500 the next day. Hernandez-Zuniga agreed to meet at the corner of Post and Larkin Streets in the Tenderloin.

On July 7, 2022, the UC drove an unmarked vehicle and parked at the southeast corner of Post and Larkin Streets. Hernandez-Zuniga approached the vehicle riding on a scooter. Hernandez-Zuniga parked his scooter and entered the UC's vehicle. The UC and Hernandez-Zuniga greeted each other and began the transaction, during which time Hernandez-Zuniga attempted to have the UC ingest a sample of the fentanyl in front of him and questioned the UC about whether he was undercover law enforcement. The UC refused and said that he was a dealer only and does not use narcotics. Hernandez-Zuniga appeared to be satisfied with the UC's response and agreed to continue with the pre-arranged fentanyl deal. Hernandez-Zuniga then reached into his backpack and handed the UC two large bags of suspected fentanyl and, in exchange, the UC handed Hernandez-Zuniga $1,500. Hernandez-Zuniga then exited the vehicle and rode his scooter away.

The transaction was both audio- and video-recorded from both inside and outside the vehicle. The suspected fentanyl tested presumptive positive and weighed approximately 56.8 grams.

### VI. The July 27, 2022 Controlled Purchase.

On July 26, 2022, an SFPD officer posing as the UC texted Hernandez-Zuniga and arranged to purchase two ounces of methamphetamine for $800 the next day. Hernandez-Zuniga agreed to meet at

DETENTION MEM.                    6
22-mj-71019 MAG

the corner of Post and Larkin Streets in the Tenderloin.

On July 27, 2022, the UC drove an unmarked vehicle and parked at the southeast corner of Post and Larkin Streets. Hernandez-Zuniga approached the vehicle riding on a scooter, parked, and entered the vehicle. The UC and Hernandez-Zuniga engaged in brief conversation and began the transaction, during which Hernandez-Zuniga reached into his backpack and handed the UC two large bags of suspected methamphetamine and, in exchange, the UC handed Hernandez-Zuniga $800. Hernandez-Zuniga then exited the vehicle and rode his scooter away.

The transaction was both audio- and video-recorded from both inside and outside the vehicle. The suspected methamphetamine tested presumptive positive and weighed approximately 57.2 grams.

**VII.    The August 4, 2022 Arrest.**

On August 4, 2022, a joint operation of SFPD officers and Drug Enforcement Administration agents executed arrest and search warrants on Hernandez-Zuniga, his residence, and his vehicle stemming from the instant charges. Officers found 162.2 grams of suspected fentanyl, 180 grams of suspected methamphetamine, 120.7 grams of suspected cocaine base, and 35.3 grams of suspected heroin in his possession. Officers also found $2,100 in cash, packaging materials, and multiple digital scales.

**VII.    Physical Surveillance, Historical Location Data, And Ping Data Confirm That Hernandez-Zuniga Commuted From Oakland Into San Francisco And, Specifically, The Tenderloin To Sell Drugs As His Source Of Income.**

Through physical surveillance both on the days of the controlled purchases and others, historical location data, and active cell phone ping data, law enforcement have confirmed that Hernandez-Zuniga commuted directly from Oakland to San Francisco and back approximately six days a week between around 9 a.m. and 5 p.m. to sell drugs. Moreover, based on subpoena returns from the California Employment Development Department, there are no wage records for Hernandez-Zuniga for the tax periods of 2019 to 2021, indicating that drug trafficking has been his sole source of income.

## LEGAL STANDARD

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required

and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. "[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where, as here, there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in prison or more, courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382–83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (stating that "a 'bursting bubble' approach might render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason"). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant;

DETENTION MEM.  
22-mj-71019 MAG  
8

(3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## ARGUMENT

### I.     Hernandez-Zuniga Is Subject To A Rebuttal Presumption In Favor Of Detention.

Hernandez-Zuniga is charged with one count of violating 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi) – Possession with Intent to Distribute and Distribution of 40 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, which carries a maximum penalty of 40 years' imprisonment, and one count of violating 21 U.S.C. § 841(a)(1) and (b)(1)(C) – Possession with Intent to Distribute and Distribution of Methamphetamine, which carries a maximum penalty of 20 years' imprisonment. Accordingly, Hernandez-Zuniga is subject to a rebuttal presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). To overcome this presumption, Hernandez-Zuniga bears the burden of production that he is *both* not a flight risk and that his release will not endanger the community. He cannot do so.

### II.    Hernandez-Zuniga Is A Danger To The Community.

The nature of Hernandez-Zuniga's offense, the strength of the evidence against him, and his criminal history all support pretrial detention.

In a perverse way, Hernandez-Zuniga was like thousands of other people who commute daily into San Francisco for their job. He would leave his apartment in Oakland around 9:00 a.m. each day and travel into San Francisco to work. He would then go home around 5:00 p.m. He worked weekends, too, but took Fridays off.

But unlike the construction worker, the teacher, or the administrative professional, whose work makes positive contributions to society, Hernandez-Zuniga peddled toxic drugs to those already gripped by addiction while also luring others who had not yet succumbed to fall victim to the narcotics he hawked. And he did so for profit.

### A. The nature of Hernandez-Zuniga's offense.

The devastating effects of Hernandez-Zuniga's conduct in the Tenderloin cannot be understated: as Mayor London Breed has stated, "We are losing over two people a day to drug overdoses, mostly to fentanyl, and mostly in the Tenderloin and SoMa. This is a public health emergency demanding a crisis level response, with massive urgency, coordination, and determination to confront this epidemic."[8]

For Hernandez-Zuniga, though, selling drugs—and particularly lethal ones like fentanyl and methamphetamine—is his chosen occupation and an opportunity to make money. And his drug dealing is far from casual. Location data for his cell phone shows that, between May 25, 2022, through June 30, 2022, Hernandez-Zuniga's device traveled from Oakland to the Tenderloin on a virtually daily basis and on a regular schedule. Over the few months that Hernandez-Zuniga interacted with law enforcement in this investigation, he sold or possessed a total of 222.5 grams of fentanyl and 257.3 grams of methamphetamine. That amount of his fentanyl alone is enough to kill one in eight people in San Francisco.[9]

Hernandez-Zuniga has demonstrated an apparent determination to deal specifically in the Tenderloin, despite living in Oakland. The five controlled purchases are but part of Hernandez-Zuniga's years-long pattern of drug trafficking in the area regardless of his numerous arrests and outstanding warrants for the same types of crimes. His "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, No. 5:15-CR-00263-EJD, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, Case No. CR 12–0124 CW (KAW), 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.' Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.").

Hernandez-Zuniga is a threat to the Tenderloin community each day he is there, and this investigation has confirmed that he has been distributing methamphetamine and fentanyl—a notoriously

---

[8] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin).

[9] *See* U.S. Census Bureau, QuickFacts, San Francisco, California, https://www.census.gov/quickfacts/sanfranciscocountycalifornia (Aug. 5, 2021).

DETENTION MEM.  10
22-mj-71019 MAG

deadly substance—on San Francisco's streets on a near-daily basis from May 2022 until his arrest on the instant charges. That conduct aligns with his drug-dealing past, which stretches back more than three years and includes multiple arrests for distributing narcotics for which he has faced no meaningful consequences. Four arrests and multiple warrants have not stopped him from spreading deadly substances into the city's devastated center and profiting off the misery of the community. Unless he is detained, the threat that he poses continues.

### B. The weight of the evidence.

Hernandez-Zuniga is very likely to be convicted of distributing fentanyl and methamphetamine. An undercover officer directly purchased narcotics from him on five occasions between May and July 2022. Each transaction took place out in public, and close-cover officers were involved in all of them. Four of the transactions were video- and/or audio-recorded. At the first transaction on May 26, 2022, the undercover officer gave Hernandez-Zuniga his phone number, which Hernandez-Zuniga immediately called so that the undercover officer would have it saved. Officers then communicated with Hernandez-Zuniga using that number via voice calls and text messages to confirm the price and location of subsequent fentanyl and methamphetamine sales. Finally, tests of substances sold by Hernandez-Zuniga confirm that they contain narcotics in excess of the five-year mandatory minimum threshold.

### C. Hernandez-Zuniga's history and characteristics.

Hernandez-Zuniga is a serial recidivist who has continued to traffic narcotics despite four narcotics-related arrests dating back to May 2019. Two of those arrests occurred within two weeks of each other. He was on probation when he was again caught peddling drugs. He also apparently cut off an ankle monitor and failed to appear in court to continue selling drugs.

Hernandez-Zuniga may argue that he is not a danger to the community because he has only one misdemeanor conviction in his criminal history. That perverse argument should be rejected out of hand because it is Hernandez-Zuniga's chronic failure to appear in court to answer charges against him that negates any possibility that he could be held accountable for his conduct. He should not benefit from his persistent refusal to comply with court orders to appear as required. The fact that he also appears to have cut an ankle monitor shows that he has no real desire to answer for his wrongdoing.

**III.    Hernandez-Zuniga Is A Serious Flight Risk.**

On four separate occasions, Hernandez-Zuniga was arrested and charged with narcotics offenses, and for three of those cases, he failed to appear in court to answer the charges as required. There is no reason to believe anything will change now.

The multiple bench and sheriff-affidavit warrants for his arrest are evidence enough that Hernandez-Zuniga gives little credence to court orders. The fact that his third arrest for narcotics trafficking occurred while he was on probation is equally probative for the fact that he is not amenable to release conditions. As if that were not enough, the fact that he likely cut his ankle monitor (and has not appeared in court since then) confirms that he is a serious flight risk.

Hernandez-Zuniga also has little reason to stay in the Bay Area but every reason to flee. The government is unaware of any community ties held by Hernandez-Zuniga: no legitimate employment, no local family, and no affiliations with community groups. A Honduran national, Hernandez-Zuniga likely has family abroad and faces a possibility of removal upon conviction. In addition, Hernandez-Zuniga likely has the means to flee: during the January 14, 2021, drug-dealing arrest alone, officers found $847 in cash on Hernandez-Zuniga; during the July 7, 2022, controlled purchase, he made $1,500; during the July 27, 2022, controlled purchase, he made $800; and when he was arrested on these charges, he was found with $2,100. Access to such cash will allow Hernandez-Zuniga to easily leave the Bay Area or the United States as he is likely to do based on his past conduct.

Finally, for the first time in his drug-dealing career, Hernandez-Zuniga is facing real and serious consequences, including a mandatory minimum. As explained above, the formidable evidence against him includes eyewitness testimony, phone records, physical evidence, and video- and audio-footage. The prospect of a federal conviction and years in prison provide Hernandez-Zuniga with significant motivation to escape the consequences of his actions and run away, as he has repeatedly done to date.

As if that were not sufficient motivation, this case has stripped Hernandez-Zuniga of the livelihood he has chosen and the only one he knows. While others in the community have decided to make a living through legitimate and respectable employment—including those who reside or work daily in the Tenderloin—drug dealing and profiting off the suffering of others is how Hernandez-Zuniga has *chosen* to make his living. Without the ability to profit off of the destitution that keeps money

flowing into his pocket, Hernandez-Zuniga has little incentive to appear in court to finally answer for his offenses.

Finally, there is simply no viable place to which Hernandez-Zuniga can be released. Even if he were released to a halfway house, as explained, there is no certainty that he will not simply walk away. Without legal employment or viable housing, the risk that Hernandez-Zuniga will flee is too great to allow him to be released while these charges are pending.

## CONCLUSION

In the ten times he has been arrested or sold drugs to undercover officers alone, Hernandez-Zuniga has sold or possessed enough narcotics to kill *everyone* living in the Tenderloin nearly four times over.[10] Four prior arrests have not deterred him from being a deadly threat to the Tenderloin neighborhood or San Francisco. In addition, he has repeatedly defied the courts' efforts to hold him to account for his actions and persists in flouting the law by returning to the streets to feed off the community's misery.

Hernandez-Zuniga is a danger to the community and a flight risk. He cannot overcome the presumption on both points. Thus, the government respectfully requests that Hernandez-Zuniga be detained pending trial.

DATED: August 8, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

\_\_\_\_/s/ Kevin Yeh_____
KEVIN YEH
Assistant United States Attorney

---

[10] *See* S.F. Mayor's Office of Housing & Cmty. Dev., Tenderloin Neighborhood Profile, https://sfmohcd.org/sites/default/files/FileCenter/Documents/2387-Tenderloin.pdf (stating that population of Tenderloin is 29,155 people).